## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

_____

| | | |
|---|---|---|
| **MARCOS COLLAZO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11-CV-2018** |
| **v.** | ) | |
| | ) | |
| **DR. PAUL TALBOT, JOHN JENNINGS,** | ) | |
| **JOHN LINVILLE, KEITH ANGLIN,** | ) | |
| **VICTOR CALLOWAY, MARY MILLER,** | ) | |
| **and LINDA DALEY (aka DAILY),** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## OPINION

This case is about an alleged deliberate indifference to a prisoner's serious medical need of severe hemorrhoids. More specifically, this case is about the standard of care required for a managed and ongoing medical condition as compared to an acute episode arising from that condition. The issue is whether a prisoner who has an ongoing medical condition under the care of a physician may survive a motion for summary judgment if he fails to demonstrate that the defendants were made aware of any signs or symptoms that were different from or more severe than those for which he was already being treated. This court holds that he cannot.

The case is before this court on a Motion for Summary Judgment filed by Dr. Paul Talbot and Linda Daily (#67) (hereinafter "Wexford Defendants") and a Motion for Summary Judgment filed by John Jennings, John Linville, Keith Anglin, Victor Calloway, and Mary Miller (#69)

(hereinafter "Danville Defendants"). The court has reviewed the briefs and evidence filed by Defendants and Plaintiff. Following this review, both Motions for Summary Judgment (#67, #69) are GRANTED.

## Factual background

 Plaintiff has had hemorrhoids since approximately 2002. (#67 exh. C, Plaintiff's Deposition, 28:19-20; 30:8-10) (hereinafter "Dep."). While housed at Cook County Jail in 2005 or 2006, the hemorrhoids became worse until they began to bleed. (Dep., 32:8-15). Plaintiff continued to suffer from bleeding hemorrhoids when he was first incarcerated at the Robinson Correctional Center, (Dep. 34:13-15), and continued to have them after being transferred to the Shawnee Correctional Center, (Dep. 36:2-6) and then the Dixon Correctional Center (Dep. 37:16-19). Plaintiff was, in his own words, "kicked out" of Dixon around April 2008, and then transferred to the Danville Correctional Center. (Dep. 38:8-13), where he continued to suffer from bleeding hemorrhoids, (Dep. 38:16-21).

On June 12, 2009, Plaintiff, was seen by Dr. Royce Larsen. (Talbot & Daily's Motion for Summary Judgment, #67 ¶ 10) (hereinafter "Wexford MSJ"). Dr. Larsen's notes indicated that Plaintiff had been having hemorrhoid problems for the past several years, with pain and bleeding with bowel movements. *Id*. A digital examination showed prolapsed circumferential hemorrhoids with no masses, but Plaintiff refused an anoscopic examination. *Id*. Dr. Larsen further noted that future treatments might include hemorrhoidectomy, fissurectomy, and lateral sphincterotomy. *Id.*

On October 26, 2009, Defendant Dr. Paul Talbot ("Talbot"), a physician with Wexford Health Sources, Inc., and the Medical Director at the Danville Correctional Center, saw Plaintiff for the first time as a patient, concerning Plaintiff's hemorrhoids and anemia. (Wexford MSJ ¶ 11). Talbot found that Plaintiff had a history of chronic hemorrhoidal bleeding, but that Plaintiff was not bleeding at the time. Talbot ordered a complete blood count exam, a follow-up to check the anemia, and Metamucil as a fiber supplement. *Id*. On October 29, 2009, Talbot held a Collegial Review with other Wexford physicians. (Wexford MSJ ¶ 12). Following this review, Plaintiff was approved to receive a hemorrhoidectomy exam and removal. *Id*.

On November 6, 2009, Talbot approved Plaintiff to see Dr. Dean Scavone, a GI specialist, at the Carle Clinic. (Wexford MSJ ¶ 13). Dr. Scavone found minimal external hemorrhoidal tissue, no evidence of thrombosed hemorrhoids, a normal sphincter, no masses in the anal canal, and "relatively unremarkable hemorrhoidal tissue." (Wexford MSJ ¶ 14). Dr. Scavone recommended a colonoscopy under IV sedation for further examination, but concluded that "Plaintiff does not have obvious external hemorrhoids that justify a hemorrhoidectomy." *Id*. Following a Collegial Review with other Wexford physicians, Talbot approved Plaintiff to receive a colonoscopy. (Wexford MSJ ¶ 16).

On December 1, 2009, Plaintiff received a colonoscopy from Dr. Scavone. (Wexford MSJ ¶ 17). Dr. Scavone concluded that Plaintiff had some very prominent Grade 3 internal hemorrhoidal veins, which were likely the source of the bleeding. *Id*. Dr. Scavone also noted the presence of external hemorrhoids and mild sigmoid diverticulosis. (Wexford MSJ exh. 8). Dr. Scavone's recommended plan was as follows:

> The patient at this point should be on a high-fiber diet. He will have
> information related to his physician at the Danville Correctional Facility. If
> the patient has ongoing issues with bleeding despite being on appropriate
> bulking agents, the patient can be referred for potential banding of his internal
> hemorrhoids.

(Wexford MSJ exh. 8).

Upon return to the Danville Correctional Center, Plaintiff denied being in pain and indicated only that he was tired. (Wexford MSJ ¶ 18). His medical notes indicate an absence of active bleeding. (Wexford MSJ exh. 9). The next day, on December 2, 2009, Linda Daily, R.N., ("Daily") noted that Plaintiff had no rectal bleeding and no complaints of pain. (Wexford MSJ ¶ 21). Following this finding, Talbot ordered Daily to discharge Plaintiff, which she did. *Id*.

On December 3, 2009, a nurse was called to the segregation unit in response to a shift commander's request regarding Plaintiff's rectal bleeding. (Wexford MSJ ¶ 24). Upon arrival, Plaintiff refused to allow the nurse to examine him, but the nurse noted a moderate amount of blood in Plaintiff's stool. *Id*.

On December 4, 2009, Talbot's notes documented that during a Collegial Review, the physicians agreed that Plaintiff was a "most difficult patient" who had engaged in "manipulative behavior which impacts on his case adversely", and also that the physicians concurred with Dr. Scavone's assessment that banding was not indicated at that time. (Wexford MSJ ¶ 25). The continued treatment plan was to continue to document any visible blood in and on formed feces, to order a CBC, and to continue Metamucil, Colace, fiber supplements, and suppositories. *Id*. Also on December 4, 2009, Talbot met with Plaintiff. (Wexford MSJ ¶ 26). Plaintiff complained that he had been bleeding again, and Talbot noted small hemorrhoidal tags, (#67 exh. 13; incorrectly, "taps" in the Wexford MSJ), at the external anal opening but no signs of lacerations

- 4 -

or bleeding.  Plaintiff provided dried blood on tissue paper, but the rectal exam showed no sign

of blood. (Wexford MSJ ¶ 26). Talbot therefore noted that the source of blood was unclear. *Id*.

Talbot ordered triple antibiotic ointment for rectal application. *Id.*

On December 8, 2009, Talbot admitted Plaintiff to the infirmary following a complaint of

rectal bleeding. (Wexford MSJ ¶ 27). Talbot's notes documented Plaintiff's "long hx [medical

history] of manipulating his hemorrhoids to trigger bleeding as a means of getting the

cell/cellmate he wants." (Wexford MSJ exh. 14). Talbot noted that he would keep Plaintiff in the

infirmary to verify bleeding. *Id*. Last, Talbot ordered Plaintiff to continue all current medications

and to receive further blood tests. *Id.*

On December 10, 2009, Plaintiff was brought from segregation to the Health Care Clinic

due to active hemorrhoidal bleeding. (Wexford MSJ ¶ 29). Plaintiff testified as follows:

> Warden Anglin and Calloway wanted to talk to me and they talked to me.
> That's why I want it on record. They talked to me and said, you know what?
> We'll break these two grievances. We'll get you out of here. Don't put these
> two grievances on us. We'll get you out of here. Where do you want to go? I
> want to go to Dixon closer to my house. They've got better medical, see if
> they can do surgery on my hemorrhoids and take care of the problem.
> He said okay. Don't put in no more grievance. Go in and see the doctor.
> Jennings, take him to see the doctor.

(Dep. 119: 20-120:8). Talbot assessed Plaintiff with a Grade 3 protruding hemorrhoid, possibly

due to self-mutilation and manipulative behavior, as well as an iron deficiency. *Id.* Talbot noted

that Plaintiff was counseled on his manipulative behavior. *Id.* Talbot further noted that Plaintiff

had been approved for hemorrhoidal banding, but that the Dr. Scavone had instead performed a

colonoscopy and indicated he was unable to complete the procedure. *Id.* Talbot's plan was to

consult further with Dr. Scavone regarding banding. *Id.*

- 5 -

On December 11, 2009, Talbot held a Collegial Review with Dr. Agrawal and they agreed that banding would be approved with colorectal surgery.  (Wexford MSJ ¶ 30).

On December 16, 2009, Plaintiff stated that he wanted to go to the Infirmary, but did not report any active bleeding. (Wexford MSJ ¶ 31). Talbot did not admit Plaintiff to the Infirmary and noted that no change to the plan was required. *Id.*

On December 17, 2009, Talbot ordered colorectal banding for Plaintiff. (Wexford MSJ ¶ 32). Talbot further found that Plaintiff had been poorly compliant as to his iron replacement therapy, which accounted for Plaintiff's low hemoglobin and hematocrit levels, as well as continued suspected mutilation of his hemorrhoids. (Wexford MSJ exh. 21).

On December 21, 2009, a medical furlough was scheduled for Plaintiff (Wexford MSJ ¶ 33). On December 24, 2009, Plaintiff complained that he was still bleeding and that he felt cold. (Wexford MSJ ¶ 34). Talbot determined Plaintiff was likely dehydrated, so he ordered a stat CBC and to notify him of the results immediately, as well as for Plaintiff to receive an extra blanket, IV fluids at 200 cc per hour for five hours, and a regular food tray. *Id.* Upon evaluation of the CBC, which revealed a hemoglobin level of 5.5, dropping to 4.9, Talbot ordered Plaintiff to be immediately transferred to the Provena Hospital emergency room, where he received a blood transfusion of five units of blood, which increased his hemoglobin level to 11.0. (Wexford MSJ ¶ 35; exh. 27). The hospital nurse reported that Plaintiff told her that he had had a bowel movement that evening that was "full of clots". *Id.* Talbot also ordered Plaintiff to be admitted to the Infirmary on return from Provena. *Id.*

On December 25, 2009, Plaintiff was admitted to the Infirmary. (Wexford MSJ ¶ 36). Talbot noted that Plaintiff could not keep his hematocrit levels high due to noncompliance with

his prescribed therapy. *Id*. Talbot further noted that Plaintiff refused to comply with a request to take his vitals. *Id.* Plaintiff also refused a hemoglobin test. (Wexford MSJ exh. 26). In the Infirmary, the LPN there noted that Plaintiff refused to take any medication or have his vitals taken until he "gets some ice water" and refused to sign a refusal form. (Wexford MSJ ¶ 37). Plaintiff further refused to do anything until he was taken to see the doctor and warden. *Id.* When Warden Williamon [*sic*] arrived at the Infirmary 1 hour and 10 minutes later, Plaintiff took his medications. (Wexford MSJ exh. 25). Plaintiff again refused a hemoglobin blood test. (Wexford MSJ exh. 28).

On December 27, 2009, Plaintiff reported that he had blood in his stool a second time since the day before, but refused a hemaglobin blood draw. (Wexford MSJ exh. 29). Also on December 27, 2009, a nurse found medications in Plaintiff's cell that had not been taken. (Wexford MSJ exh. 30). The medical note indicated that Plaintiff had complained of further rectal bleeding, but no indications of acute distress were noted. *Id.* Plaintiff was ordered to retain his bowel movements and evidence of rectal bleeding to show the nurse for further observation. *Id.*

On December 28, 2009, Plaintiff refused his vital signs, mediations, and a hemaglobin blood draw, but refused to sign the refusal form. (Wexford MSJ ¶ 41; Wexford MSJ exh. 32). Plaintiff also demanded a discharge from the Danville medical facility against the advice of Talbot. *Id*. Talbot later saw Plaintiff, and his notes also indicate that Plaintiff refused any labs, vital signs, and medication. (Wexford MSJ exh. 33). Talbot counseled Plaintiff and informed him of the need to take his $FeSO_4$ (iron supplement) therapy. *Id.* Plaintiff stated that no one listened to him and demanded that he be released from segregation and transferred out of

Danville. *Id.* Talbot's notes read further, transcribing Plaintiff's complaint: "I will not start over with another MD and if you won't get me out of seg or transfer me I refuse all medical/health care." *Id.* Following this conversation and the futility of proceeding with medical treatment, Talbot released Plaintiff from the infirmary. (Wexford MSJ exh. 34).

On December 29, 2009, a segregation officer called the healthcare unit and indicated that Plaintiff was exhibiting rectal bleeding. (Wexford MSJ exh. 35). Plaintiff refused to be brought to the healthcare unit, refused any medical care, and refused to sign the refusal form after three attempts. *Id.*; (Wexford MSJ exh. 36). The officer noted that Plaintiff did not exhibit any weakness or dizziness, but did note bright red blood of a "moderate amount" on the toilet paper next to the toilet. *Id.* Plaintiff stated to the officer, "I want out of Danville. Send me somewhere else." *Id*. On the same day, Talbot ordered Plaintiff to psychological evaluation and testing for irrational behavior that was impacting his health care and management. (Wexford MSJ exh. 37).

On December 30, 2009, Plaintiff refused his medical furlough to Carle Clinic for banding of his hemorrhoids. (Wexford MSJ ¶ 45). On January 4, 2010, Plaintiff was transferred to Pontiac Correctional Center. (Wexford MSJ ¶ 46). On April 12, 2011, this court received notice that Plaintiff had been transferred to Illinois River Correctional Center. (#11). On April 16, 2013, this court received notice that Plaintiff had been transferred to the Hill Correctional Center. (#84).

## Procedural posture

On January 14, 2011, Plaintiff filed his original complaint from Pontiac Correctional Center, against Warden Anglin, "John Doe", "Jennings", "Linville", and "M. Miller". (#1). On

January 26, 2011, Plaintif filed a pro se motion for extension of time, (#2), which this court denied as moot in a text order on January 31, 2011 as it had already directed the clerk of the court to request trust fund ledgers from the prison.

On March 22, 2011, Plaintiff filed an Amended Complaint against Lt. Linville, Sgt. Jennings, Warden Anglin, Ass't. Warden Holloway, M. Miller, and "Dr. John Doe". (#9) ("Danville Defendants").

On March 29, 2011, this court held a § 1915A merit review. The court dismissed "Dr. John Doe", who was identified as Dr. Ameji, because Plaintiff refused health care from Dr. Ameji and wanted to see a different doctor. The remainder of the complaint was permitted to proceed. On April 12, 2011, Plaintiff filed a notice that he had been transferred to the Illinois River Correctional Center. (#11). On June 8, 2011, the Danville Defendants filed their Answer and Affirmative Defenses. (#24). On June 22, 2011, this court held a scheduling conference and allowed Plaintiff to substitute Dr. Paul Talbot for defendant "Dr. John Doe".

On August 2, 2011, Plaintiff filed the present and operative Second Amended Complaint against John Jennings, John Linville, Keith Anglin, Victor Calloway, Mary Miller, Linda Daily,[1] and Paul Talbot. (#34). On September 21, 2011, Daily filed her Answer and Affirmative Defenses, (#40), and on October 21, 2011, Talbot filed his Answer and Affirmative Defenses, (#43) (collectively, "Wexford Defendants"). On January 31, 2012, the Danville Defendants filed their Answer and Affirmative Defenses, instanter. (#58).

---

[1] Although this court's docket has used the spelling "Daley" for this defendant's last name, that spelling was taken from Plaintiff's filing. The Motion for Summary Judgment spells the defendant's last name as "Daily", so this opinion will proceed by using that spelling. The Clerk of the Court is directed to modify Defendant's name to "Linda Daily".

On October 19, 2012, the Wexford Defendants filed their Motion for Summary Judgment. (#67). On October 31, 2012, the Danville Defendants filed their Motion for Summary Judgment. (#69). On November 13, 2012, Plaintiff filed five separate documents in response to the Wexford Motion for Summary Judgment. (#71-75) (collectively, "Plaintiff's Wexford Response"). On November 21, 2012, Plaintiff filed his Response to the Danville Motion for Summary Judgment. (#76) ("Plaintiff's Danville Response"). On November 27, 2012, the Wexford Defendants filed their Reply. (#77). On December 3, 2012, the Danville Defendants filed their Reply. (#78). On January 8, 2012, Plaintiff filed two surreplies. (#79-82).

## Analysis

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986*); Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must

show what evidence it has that would convince a trier of fact to accept its version of events."

*Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004). If it is clear,

based upon the undisputed facts, that a plaintiff will be unable to satisfy the legal requirements

necessary to establish his case, summary judgment is not only proper, but mandated. *See Padula*

*v. Leimbach,* 656 F.3d 595, 600–01 (7th Cir. 2011). "Federal courts may grant summary

judgment under Rule 56 on concluding that no reasonable jury could return a verdict for the

party opposing the motion." *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 60 (7th Cir. 1990).

The Eighth Amendment forbids prisons and prison doctors from engaging in deliberate

indifference to serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

However, "a prison official cannot be found liable under the Eighth Amendment for denying an

inmate humane conditions of confinement unless the official knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  To raise an Eighth Amendment issue,

"[t]he infliction [of punishment] must be deliberate or otherwise reckless in the criminal law

sense, which means that the defendant must have committed an act so dangerous that his

knowledge of the risk can be inferred or that the defendant actually knew of an impending harm

easily preventable." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). This bar is so high that

"[m]ere negligence or even gross negligence does not constitute deliberate indifference." *Id.* "A

prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a

constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence

intentional mistreatment likely to seriously aggravate the prisoner's condition." *Id.* at 592

- 11 -

(internal quotations marks omitted). Further, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).

## I. Plaintiff's claims

In his Second Amended Complaint, Plaintiff makes five claims. First, Plaintiff alleges that on December 1, 2009, he was referred out of Danville to a specialist who performed a colonoscopy. (Am. Compl. ¶ 3). Plaintiff then alleges that he was bleeding profusely as a result of the colonoscopy, and when he returned to Danville, he was admitted to the health care unit until his bleeding subsided or he was examined by a doctor. (Am. Compl. ¶ 4). Plaintiff alleges that on December 2, 2009 he requested to see a doctor, but that Daily denied his request, indicating that they "needed his bed space" and that he did not have a medical emergency. (Am. Compl. ¶ 5). Plaintiff alleges that he was "bleeding heavily", but Daily told him, "You're not bleeding; when I see some blood, I'll keep you here, but you got to get out of here." (Am. Compl. ¶ 6). Plaintiff claims that Daily was deliberately indifferent to his serious medical needs.

Second, Plaintiff alleges that on December 3, 2009, around 3:00am he had "used the restroom and noticed that he was bleeding excessively." (Am. Compl. ¶ 7). Plaintiff alleges that when he told Linville as much, Linville told Plaintiff to go back to his cell and did not call any medical personnel. (Am. Compl. ¶ 8). Plaintiff alleges that he told Linville that he had just had a medical procedure, a complication of which was bleeding, and Linville wrote an Inmate Disciplinary Report for Plaintiff for disobeying a direct order. Plaintiff claims that Linville was deliberately indifferent to his serious medical needs.

- 12 -

Third, Plaintiff alleges that on December 3, 2009, in the morning, he was bleeding excessively, in severe pain, and weak from loss of blood, and informed Jennings as much. (Am. Compl. ¶ 11). Plaintiff alleges that Jennings saw his bleeding, and that Jennings said he would get a nurse, but that he never did so. (Am. Compl.  ¶ 12). Plaintiff claims that Jennings was deliberately indifferent to his serious medical needs.

Fourth, Plaintiff alleges that on December 3, 2009, at approximately 8:00am, Anglin saw the blood on the floor and toilet and told Plaintiff that he would be seen by a doctor, (Am. Compl. ¶ 14), but that Anglin did not contact medical personnel. (Am. Compl. ¶ 15). Plaintiff alleges that on December 7, 2009, he did see Talbot, but he was no longer bleeding at that time. (Am. Compl. ¶ 15). Plaintiff further alleges that on December 8, 2009, Talbot saw Plaintiff bleeding, but did not administer any medical treatment. (Am. Compl. ¶ 16). Plaintiff also alleges that Anglin and Calloway knew that Plaintiff was in segregation with chronic bleeding and did not provide him with medical care for his bleeding. (Am. Compl. ¶ 17). Plaintiff claims that Anglin, Calloway, and Talbot were deliberately indifferent to his serious medical needs.

Fifth, Plaintiff alleges that on December 24, 2009, when he was in the shower, he lost so much blood that he passed out. (Am. Compl. ¶ 19). Upon recovering consciousness, he alleges that he was so weak he could not stand. *Id*. Plaintiff alleges that he lost six pints of blood. *Id*. Plaintiff alleges that Miller covered up the failure to attend to his serious medical needs by untruthfully indicating that he had refused surgery and medical care. (Am. Compl. ¶ 20). Plaintiff claims that Miller was deliberately indifferent to his serious medical needs.

## II. Standard for deliberate indifference to an ongoing medical condition

Proving deliberate indifference to serious medical needs is inherently a context-sensitive, fact-intensive analysis. *Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007). Here, Plaintiff suffered from an ongoing managed condition. Reading his complaint liberally, Plaintiff alleges that certain defendants ignored his demands for particular and specific medical treatment, whereas other defendants ignored his demands for care following an acute episode that required medical assistance above and beyond that which he was currently receiving. Because Plaintiff's complaints are all related to his existing condition, the traditional inquiry must be modified. The appropriate question is this: Did prison officials and medical staff see or hear something *out of the ordinary* that would have presented sufficient facts from which the inference could be drawn that a substantial risk of serious harm to a prisoner exists, and then subsequently disregard that excessive risk to the prisoner's health or safety? In many § 1983 prisoner cases, prison officers are not liable under the Eighth Amendment even though they recognized a substantial risk of serious harm existed because they did not disregard that risk. Instead, this fact pattern presents an issue regarding the first prong. If a prison official knows that a prisoner has a managed medical condition, what degree of treatment is constitutionally required in response to an acute episode?

Here, a prisoner had an ongoing medical condition of hemorrhoids. Left untreated, hemorrhoids can certainly become extremely painful and can constitute an excessive risk of serious injury, requiring medical intervention. *See, e.g.*, *Jones v. Natesha*, 151 F. Supp. 2d 938, 944 (N.D. Ill. 2001) (listing cases). Even Defendants concede as much. However, Plaintiff readily admits that throughout the entire time he was at Danville Correctional Center,

"everyone" knew that a physician was seeing him for his hemorrhoids. (Dep., 105:11-14). He also admits that his hemorrhoids were bleeding the entire time he was at Danville. (Dep., 38:19-24). So the fact that he was bleeding from his hemorrhoids was a regular occurrence. It was not out of the ordinary. It happened. It was unfortunate and it was painful, but he was receiving a treatment regimen of iron supplements for anemia, a topical ointment, and fiber supplements to soften and bulk the stool. The correctional officers and medical staff all knew that his hemorrhoids bled. In fact, they teased him about it.[2]

If the correctional officers and staff knew that Plaintiff's hemorrhoids bled on a regular basis, and if they knew that Plaintiff was under the care of Dr. Talbot, then, on the sole basis that his hemorrhoids were bleeding—and without some kind of notice of a change in quantity (*e.g.* bleeding drastically more) or kind (*e.g.* subjectively feeling faint, cold, or having an objectively low blood count) of symptom—no reasonable jury could say that those officers or staff had knowledge that Plaintiff was suffering from any *excessive* risk of harm. Thus, a prisoner with an *ongoing and managed* medical condition who claims that an individual in his institution of confinement was deliberately indifferent to his serious medical need must show something more than the baseline symptoms that he had previously presented and to which the staff had become accustomed. In response to the argument that bleeding is, in and of itself, a dangerous sign, the Eighth Amendment does not guarantee prisoners the right to be healthy and hale.

---

[2] "What I was asking from Sergeant Jennings also is stop making fun of me and stop making fun of my hemorrhoids, because he also was the one that incited the Inmates calling me names and one of the names was blood balls, which is kind of funny, but one of them was saying, hey, blood balls, and he would laugh. When I would go take a shower, oh, hey, you blood balls." (Dep. 93:17-23).

An example may be illustrative. Suppose a prisoner is diagnosed with diabetes, and the staff, although aware of his condition, affirmatively refuse to give him insulin. Surely they have violated his Eighth Amendment rights. However, suppose he is given insulin regularly such that his blood glucose levels are mostly stabilized. Sometimes they fluctuate, as is the case with individuals with diabetes, but they do not swing so far as to put him into any danger of harm. He may still suffer some long-term complications and symptoms, such as mild retinopathy or neuropathy, but these can happen even under the best of care. Can he sustain a new action for deliberate indifference to serious medical needs? No, of course not. Although he is indeed suffering from a serious medical condition, he is under the care of a physician and receiving treatment (although he may not agree with the quality of that treatment). His diabetes may be serious, but the prison was not indifferent to those needs. Then suppose that he has sudden changes in vision, deep gasping breaths, profuse sweating, pain in the abdomen, and vomiting. His blood glucose levels are very elevated. These symptoms—either subjective or objective—are sufficiently different in kind or quantity such that the officials now have enough facts that they can and should draw the inference that this acute episode is a *new* substantial risk of serious injury, even though his diabetes is an existing medical condition. If he demands to see a doctor, and the correctional officers refuse; or if he sees a doctor, the doctor reads his blood glucose levels to be way above normal, and yet does nothing, the prison may then be liable again.

Similarly, Plaintiff had bleeding hemorrhoids. Taken out of context, and on its own merits, a prisoner who complains to a correctional officer for the first time that he is experiencing rectal bleeding can likely demonstrate  deliberate indifference if he is not taken to a

doctor within a reasonable period of time. That is the picture that Plaintiff is painting here: He complained to the Danville Defendants that he was bleeding and they did nothing. He complained to Daily that he was bleeding and she discharged him. But that is not the whole picture. Plaintiff also admitted that he bled regularly enough that prison officials knew that his hemorrhoids bled. He was seeing his physician, Talbot, on a routine basis. Talbot had prescribed a treatment plan. The correctional officers or medical staff could not possibly have knowledge of any substantial risk of serious harm as long as he did not evince or complain of any subjective signs or symptoms other than the bleeding of the moderate quantity as he had experienced in the past. Further, as long as his blood tests were not showing that he was grossly anemic, there would be no objective indication that he was at risk of harm from the bleeding.

A comparison may be drawn to the delay exception. "A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate indifference claim so long as the medical condition is sufficiently serious or painful." *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir.2008) (internal citations omitted). However, "the failure to obtain immediate medical care… constitutes an Eighth Amendment violation only if the delay was objectively, sufficiently serious to constitute the denial of the minimal civilized measures of life's necessities." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (internal quotation marks omitted). Expanding on this concept, the Second Circuit has held that

> [w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim.

[ * * * ]

[H]owever, where the prisoner is receiving appropriate on-going treatment for his condition, but, instead brings a narrower denial of medical care claim based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner.

*Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (emphasis in original) (internal quotation marks omitted). The requirement that a *delay* is objectively and sufficiently serious has the same rationale as the need to examine whether the *deterioration* of the prisoner's condition was objectively and sufficiently serious. Plaintiff's underlying medical condition, which was stable and managed, must change substantially enough that his condition is now severe enough to warrant a categorical change to his ongoing medical treatment. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (*citing Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995)); see also *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) ("However, the action will not lie unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay."). This court declines to address the issue of whether verifying medical evidence in the record is required.

## I. Wexford Defendants

### *Defendant Talbot*

Defendants Dr. Paul Talbot and Linda Daily are both employees of Wexford Health Sources, which provides medical services to the Danville Correctional Center. Regarding

Plaintiff's claims against Talbot, Talbot concedes that Plaintiff's hemorrhoids and resulting blood loss can constitute a serious medical need if left untreated. (Wexford MSJ p. 15). However, Talbot argues that he did not disregard that risk. First, regarding Plaintiff's general ongoing medical condition, Talbot saw Plaintiff on October 26, December 7, December 10, December 24, December 25, December 28, and December 29, 2009. That is seven times in a three-month period, six of which were in one month, all of which were for the same condition. Plaintiff admits that Talbot prescribed and provided hemorrhoid ointment, pain medication, medication to prevent clotting, and referrals to see specialists. (Dep., 43:4-23). On December 24, 2009, when Plaintiff felt cold and had allegedly fainted from blood loss, Talbot ordered an immediate blood test and be informed of the results immediately. When Talbot discovered that Plaintiff's hemoglobin levels were excessively low at 5.5, Talbot sent Plaintiff to a hospital to get a blood transfusion. Therefore, there is no genuine issue of material fact regarding whether Talbot was deliberately indifferent to Plaintiff's ongoing medical condition.

Second, Plaintiff complains that he did not receive banding surgery that he was scheduled to receive from Dr. Scavone on December 1, 2009. The very fact that Talbot referred Plaintiff out to a specialist is evidence that Talbot was not deliberately indifferent to Plaintiff's underlying condition. Plaintiff concedes that he saw specialists on at least two occasions. (Dep., 43:4-23). In fact, Talbot originally wanted to order banding surgery and only changed his plan following Dr. Scavone's recommendation. Failing to following a specialist's advice can constitute deliberate indifference to serious medical needs. *Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004). ("We held that the six-month delay in providing an appointment with a specialist and the refusal to then follow the specialist's advice, if proven, met the standard for deliberate

- 19 -

indifference to serious medical needs."); *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011)
("Allegations of refusal to provide an inmate with prescribed medication or to follow the advice
of a specialist can also state an Eighth Amendment claim."); *Snow v. McDaniel*, 681 F.3d 978,
986 (9th Cir. 2012) ("[T]he circumstances here raise an inference that the defendants were
unreasonably relying on their own non-specialized conclusions with deliberate indifference to
[the plaintiff's] medical needs.").

While the inverse is not necessarily true, this court agrees that, given the circumstances, when
Talbot followed the specialist's advice, he was not adopting a treatment plan "so blatantly
inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's
condition." *Snipes*, 95 F.3d at 592. Talbot prescribed iron supplement therapy, fiber supplement
therapy, suppositories, and consistently and regularly ordered a variety of blood tests to review
Plaintiff's blood levels. To the extent that Plaintiff's hemoglobin levels were abnormally low,
the Wexford Defendants note that both Talbot and a nurse have observed that Plaintiff refused to
take his medications, specifically, his iron supplements. Plaintiff does not deny that assertion.
There is no genuine issue of material fact concerning whether Talbot was deliberately indifferent
for failing to order banding surgery.

Third, Plaintiff alleges that on December 8, 2009, Talbot was deliberately indifferent
because he did not examine Plaintiff's hemorrhoids, and Plaintiff wanted him to. A prisoner's
mere "disagreement with the selection of medicine and therapy falls well short of demonstrating
deliberate indifference to a serious medical need." *Abdul-Wadood v. Nathan*, 91 F.3d 1023,
1024-25 (7th Cir. 1996). This claim is without merit.

Fourth, Plaintiff makes vague accusations that both Wexford Defendants were "actively engaged in fabricating medical documents in the plaintiff's medical files". (#72 ¶ 13). In support of this assertion, Plaintiff cites to his own deposition, averring that  Talbot's notes suspecting Plaintiff of self-mutilating and demonstrating a manipulative behavior was "absurd", "crazy", or a "fabricat[ion]". *See, e.g.,* (Dep., 14:20-23; 12:9-13). Fabrication or falsification of medication records—an allegation to which Talbot does not even respond—is not an actionable clam under the Eighth Amendment. This claim is without merit as well.

Fifth, Plaintiff complains in his Affidavit (#72) to his Response (#71) that "on 12-1-09 Dr. Scavone did two (2) incisions that directly caused the plaintiff to bleed profusely, without disclosing the procedure to plaintiff or I.D.O.C. medical staff." Plaintiff's deposition also mentions this incident. There, he indicated that

> Dr. Talbot, he looked at me and he seen the two incisions. He seen it with the nurse. He didn't say right there and then—I believe that was the 7th. He didn't say right there and then—you see, I wasn't bleeding. I cleaned up myself so he could look at me, and he seen those two incisions. He goes, there's two incisions here. That must have been in the colonoscopy. That must have been Dr. Scavone. I was trying to tell him. I'm like, what is that, sir? What is the two incisions? Because they had put me to sleep.
>
> [ * * * ]
>
> Them two incisions, from this date, and she's writing it down, I don't know where they came from. They must have came from Dr. Scavone, the outside hospital. That's why when I was telling you it was spraying, they seen it spraying. Because the same thing happened in the colonoscopy back in 2007 in Robinson and when I came back from the colonoscopy, I was bleeding profusely. I was bleeding.
>
> [ * * * ]

- 21 -

> [W]hen I was in the washroom, I felt two burning like holes. Those were the
> incisions. I let [Dr. Talbot] know…. And I'm like, wow. He's like, oh, okay. Him
> and the nurse, they were taking down notes. They never got back to me, sir.

(#67 exh. C, 17:1-12; 23:8-16). The Wexford Defendants do not reply to this assertion, or for

that matter, any of the filings in Plaintiff's Response, on the grounds that Plaintiff's five filings

do not comply with Local Rule 7.1(D)(3). The Wexford Defendants are not correct in their

reading of Local Rule 7.1. As noted in Local Rule 7.1(D)(6), "Local Rule 7.1(D) does not apply

to pro se litigants, social security appeals, or any other case upon the showing of good cause."

Plaintiff is a *pro se* litigant, and accordingly, Local Rule 7.1(D) does not apply to him. Counsel

is reminded to read the rules carefully in the future, especially when invoking them adversely.

If a party's affidavits are contradicted by earlier deposition testimony, subsequent "[s]elf-

serving affidavits without factual support in the record will not defeat a motion for summary

judgment." *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993). However,

"[p]rovided that the evidence meets the usual requirements for evidence presented on summary

judgment—including the requirements that it be based on personal knowledge and that it set

forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an

acceptable method for a non-moving party to present evidence of disputed material facts." *Payne

v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). "[I]n reviewing a motion for summary judgment

where each party's testimony relays a different version of the facts, [the court] must view those

facts in the light most favorable to the party opposing the motion." *Id.* However, Dr. Scavone is

not a named defendant in this case. Further, Plaintiff does not indicate in what way he thinks the

Wexford Defendants were deliberately indifferent. Accordingly, this allegation is not one on

which relief may be granted.

- 22 -

Sixth, Plaintiff claims that between December 1, 2009, and December 24, 2009, the Wexford Defendants were aware of his continuous bleeding, and yet ignored his condition, directly creating his need for a blood transfusion. Although the Wexford Defendants dispute that they were aware that Plaintiff had been bleeding, they do concede, in this situation, that the pain and bleeding resulting from severe hemorrhoids can constitute a severe risk of harm. However, as the Wexford Defendants argue, they were not deliberately indifferent to that risk of harm. Plaintiff does not dispute that up until December 25, 2009, Talbot had regularly ordered blood tests, and Plaintiff had regularly complied with those. Plaintiff does not allege that the Wexford Defendants knew that his hemoglobin levels were so low as to be dangerous during this time. He only alleges that he lost so much blood on December 24th that he lost consciousness. Plaintiff was brought to the medical unit and Talbot ordered blood tests. In response to that blood test, which showed an excessively low hemoglobin level, Talbot ordered Plaintiff be taken to the ER and given a blood transfusion. After December 25, 2009, Plaintiff regularly refused to allow the nurses to take his vital signs or draw his blood, thereby making it impossible for the Wexford Defendants to monitor his hemoglobin levels. Plaintiff admits that, "They were saying I was refusing but, no, I was telling them after the fact, after the 25th and Christmas day, I wanted none of you to touch me." (Dep., 28:13-15).

Plaintiff exhibited similar manipulative behavior, as documented by his signed refusal of medical services forms. There were also several forms where Plaintiff not only refused medical treatment but also refused to sign the forms. Plaintiff readily admits that he engaged in such behavior in order to force the medical staff to do things his way. During his deposition, he admitted the following:

- 23 -

Q [Wexford Defendants]: On the 8th did you refuse any medical treatment from any
   of the nurses?
A [Plaintiff]: No.
Q:  So they tried to take your vitals. Did you allow them to take your vitals on the
    8th?
A:  No.
Q:  You refused vitals?
A:  Yes.
Q:  Did you refuse medication?
A:  No.
Q:  Did you refuse to allow them to evaluate you?
A:  No. First I wanted him to examine me. First I wanted him to take me to his office
    and examine me, and he never came.
Q:  So you refused medical treatment from the nurses because you wanted to see the
    doctor first?
A:  Exactly, just from the nurses but then afterwards I gave in in the night. On the 8th
    I told them, no, no, no. Then after that they took vitals later on in the night.

Dep., 117:1-21).[3] There is no genuine issue of material fact as to whether Talbot was deliberately

indifferent to Plaintiff's serious medical needs for the acute episode Plaintiff suffered on

December 24, 2009. Accordingly, the motion for summary judgment is granted as to Defendant

Talbot.


*Defendant Daily*

Regarding Daily, Plaintiff alleges that on December 2, 2009, he was bleeding when he

returned from his colonoscopy with Dr. Scavone, and Daily did not attend to his medical needs

of bleeding, but instead, discharged him from the infirmary. (Dep., 60:1-11). In response to the

Wexford Defendants' counsel's question, "You said that you sued Nurse Daily because she was

---

[3] This court notes, as an aside, that the doctors never observed Plaintiff to bleed while he was
under their supervision in the medical care unit (and Plaintiff does not contest as much), and
that, along with a documented history of manipulative behavior, Plaintiff's acute episode
occurred on Christmas Eve.

rude and because you thought she ignored your medical complaints," Plaintiff responded, "Yeah, and she didn't do her duties. It was to tend to my medical need and it was an emergency. It was blood." Dep., 57:20-58:2). The parties disagree on whether Plaintiff was in pain or bleeding at that time, *compare* (Wexford MSJ ¶¶ 21-22), but Plaintiff argues that Daily "should have left [him] there in the infirmary and followed up and seen [him] after the blood subsided that you're going to be all right, you're not going to bleed to death", rather than discharge him. (Dep., 60:24-61:3).

Daily responds that she "received orders from Dr. Talbot for the Plaintiff to be discharged from the Infirmary", and that "[c]onsistent with the orders of Paul Talbot, M.D., [she] discharged the Plaintiff from the Infirmary." (Wexford MSJ 19). Daily argues that she "does not have the ability to order treatment or override the decision of Paul Talbot, MD." *Id*. However, this is a red herring. Whether Daily had permission or authority to override Talbot's discharge order is irrelevant to whether she was or was not deliberately indifferent to Plaintiff's bleeding. The standard is the same regardless of the position or authority of a prison official. If Plaintiff was in fact bleeding at the time, as he testifies, then Daily should have done something, whether it was to confer with Talbot, treat Plaintiff before discharging him, or examine him to confirm that he was in no substantial risk of serious harm.

Critically, however, Plaintiff does not testify that when Daily evaluated him during this incident he was bleeding significantly more severely than regularly. He only claims that he had been experiencing rectal bleeding—and more so, the only evidence he claims he provided to her was blood in the stool, rather than active bleeding. (Dep. 14:9-15) ("Linda Daily said, okay, well, you're out of here. You're not bleeding. I was bleeding. They just didn't want to take a

- 25 -

look at the blood in the stool. So I told her, well, why are you kicking me out? Because your issue is not an emergency."); (Dep. 57: 9-13) ("She was deliberately indifference [sic] by being rude and by just ignoring that I had a medical emergency, which it was bleeding. Everything boils down to bleeding. That's the key. That's why I put her on my lawsuit."). Accordingly, there is no genuine issue of material fact regarding whether Daily was deliberately indifferent to Plaintiff's serious medical needs for the December 2, 2009 episode.

Plaintiff also alleges in his deposition that Daily was deliberately indifferent by telling the correctional officers that he mutilated himself. (Dep., 58:17-60:5); (#72 ¶ 11). This claim is facially meritless as it is not a claim upon which relief may be granted, and no further discussion is required.

None of Plaintiff's complaints demonstrates that the Wexford Defendants were deliberately indifferent to his serious medical needs. To the extent that they refused to order surgery, Talbot not only relied on the advice of a specialist, but also prescribed a variety of alternative therapies that he testified are medically adequate. Plaintiff does not contend that the alternative therapies were so blatantly inappropriate as to evidence intentional mistreatment, just that he wanted surgery. Finally, they monitored his blood levels and ordered a transfusion when it was necessary. To the extent that the Wexford Defendants ignored Plaintiff's bleeding, Plaintiff had an ongoing medical condition, one symptom of which was persistent bleeding. The hemorrhoids and bleeding could have been managed had Plaintiff complied with his treatment regimen. Regardless of his noncompliance, Plaintiff did not at any time evince or indicate to the Wexford Defendants any subjective or objective signs or symptoms of a deterioration in his condition such that the Wexford Defendants could have had any knowledge that Plaintiff was in

- 26 -

substantial risk of serious harm. Summary judgment is appropriate and is granted as to the Wexford Defendants on all claims.

## II. Danville Defendants

Plaintiff has also made claims against Linville, Jennings, Anglin, Calloway, and Miller, employees of the Danville Correctional Center. As a general proposition, "[n]on-medical defendants… can rely on the expertise of medical personnel.… [I]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). "However, nonmedical officials can be chargeable with deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id*. (internal editing marks and quotation marks omitted). "[A] nonmedical administrator [is] entitled to defer to the judgment of jail health professionals so long as he did not ignore [the prisoner-plaintiff]." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). This line of jurisprudence comports with today's holding, in that a prison official who knows that a prisoner is being treated by a physician can generally assume, without further health complaints, that the presentment of ongoing and managed symptoms are not, alone, sufficient to demonstrate a substantial risk of serious harm.

### *Linville*

Plaintiff's testified that on December 3, 2009, at 3:00am, while in general population, he got up out of bed, went to the washroom, and discovered that he was bleeding. (Dep., 95:14-17).

- 27 -

Plaintiff then went to Linville and told him that he was "a little bit in pain" and that he had been suffering from rectal bleeding after his colonoscopy. Plaintiff testified that Linville ignored his request for medical treatment, did not take him to the medical care unit, did not "call a code three" (which is to initiate medical emergency procedures), and instead, cuffed him and took him into segregation. (Dep., 95:24-98:17). Plaintiff testified that due to Linville's actions, Plaintiff "almost bled to death". (Dep., 99:14-15). Plaintiff's testimony is facially noncredible. Even drawing all inferences in favor of Plaintiff, this court cannot believe that Plaintiff "almost bled to death" but was only "a little bit in pain". Further, in order to prevail in a claim of deliberate indifference to serious medical needs, a plaintiff must demonstrate that a "prison official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Plaintiff's testimony itself fails to describe any facts that would have suggested to Linville that Plaintiff was in substantial risk of serious harm more than the baseline level of mild to moderate bleeding as he had previously been experiencing, such as leaving a trail of blood while walking over to Linville or presenting blood-soaked clothes. The Eighth Amendment does not require that prison officials provide prisoners with medical care merely on the prisoner's say-so. Accordingly, summary judgment is granted on Plaintiff's claim against Linville.

*Jennings*

Plaintiff testified that he asked Jennings to get him a doctor, (Dep. 104:17-20), but Jennings did not, (Dep. 64:3-16), and that Jennings should have called a code three emergency

- 28 -

but did not, (Dep. 92:19-20). Plaintiff testified that Jennings saw the blood in Plaintiff's cell, (Dep., 92:14-17; 104:15-17) and cleaned up that blood, (Dep., 63:17-20). The only relevant fact in the record is that Jennings saw the blood on Plaintiff's toilet and in his cell. Because Plaintiff was under Talbot's care, and because Plaintiff's bleeding hemorrhoids was an ongoing, managed symptom, there are no facts in the record that would have provided Jennings with sufficient information such that he had knowledge of a substantial risk of serious harm. Accordingly, summary judgment is granted on Plaintiff's claim against Jennings.

*Anglin*

Plaintiff testified that on December 3, 2009, at approximately 8:00am, Anglin saw the blood on the floor and toilet and told Plaintiff that he would be seen by a doctor but that Anglin did not contact medical personnel. (Dep., 68:24-69:7). However, Plaintiff testified that he did see a doctor on December 4, 2009 in regard to his bleeding hemorrhoids, (Dep., 104:21-24), and Defendants' medical records corroborate that consultation, (#67 exh. 12). Plaintiff does not testify that he told Anglin of any other symptoms other than bleeding. Anglin therefore had no knowledge of a substantial risk of serious harm. To the extent that Plaintiff claims that he was injured by the delay in seeing a doctor, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). Plaintiff has placed no verifying medical evidence in the record. Accordingly, summary judgment is granted on Plaintiff's claim against Anglin.

*Calloway*

Plaintiff testified that Calloway saw him bleeding on December 7th or 8th, 2009, and December 10th, 2009, and refused to call a code three (Dep. 135:8-13). Plaintiff also testified that he asked Calloway to take him to the doctor four times between December 1st and 24th, 2009, but Calloway did not do so. (Dep. 76:23-77:6). Plaintiff did not testify that he informed Calloway of any other complaint. For the same reasons that summary judgment is granted for the other Danville Defendants, summary judgment is also granted as to Calloway.

*Miller*

Plaintiff testified that Miller did not treat him after Linville took him into segregation, and that she saw him bleeding following his colonoscopy but did nothing about it (Dep., 84:18-85:18). Plaintiff further claimed that he wanted surgery and Miller did not order it for him. (Dep., 85:24-86:3; 105:15-106:1). For the same reasons that summary judgment is granted for the other Danville and Wexford Defendants, summary judgment is also granted as to Miller.

IT IS THEREFORE ORDERED THAT:

(1) The Wexford Defendants' Motion for Summary Judgment (#67) is GRANTED.

(2) The Danville Defendants' Motion for Summary Judgment (#69) is GRANTED.

(3) The Clerk of the Court is directed to modify Linda Daley's name to Linda Daily.

(4) This case is terminated.


ENTERED this 20th day of May, 2013

**s/ Michael P. McCuskey**

MICHAEL P. McCUSKEY
U. S. DISTRICT JUDGE